**Karl G. BYRD, Sr.**

v.

**THE BALTIMORE SUN COMPANY, et al.**

**No. CIV. JFM–00–2677.**

United States District Court, D. Maryland.

Aug. 29, 2003.

Ralph T. Byrd, Laytonsville, MD, for Plaintiff.

Howard K. Kurman, Laura L. Hoppenstein, Offit, Kurman, Yumkas and Denick, PA, Owings Mills, MD, Charles P. Lamasa, Charles P. Lamasa Attorney at Law, Baltimore, MD, for Defendants.

## MEMORANDUM

MOTZ, District Judge.

Karl Byrd, Sr. filed suit against The Baltimore Sun Company ("The Sun") and the Baltimore Graphic Communications Union Local 31 (the "Union") alleging unlawful employment discrimination and retaliation in violation of Title VII and 42

U.S.C. § 1981.[1] The parties have conducted discovery, and defendants now move for summary judgment. For the reasons discussed below, I will grant defendants' motions.

## I.

Byrd, an African–American, began working for The Sun's paper handling department in 1979.[2] (Compl.¶ 8.) In October 1997, Byrd discovered a note in his employment record detailing an insubordinate act on his part in June 1996. (*Id.* ¶ 17; Sun's Mem, Ex. 5.) Believing the note to be inaccurate, Byrd requested that the note be removed from his file. (*Id.* ¶ 18.) When the company determined the note was placed in the file for appropriate reasons and refused to remove it, Byrd complained to the Union. (*Id.* ¶ 25.) As of that time, Byrd's conditions and terms of employment had not been adversely affected by the note in any way. (Byrd Dep., Sun's Mem, Ex. 2 at 52–53.) After investigating, the Union chose not to pursue this matter further. (Compl. ¶ 27, Pl.'s Opp. Ex. 1 at 4.)

On August 20, 1998, Byrd filed a complaint with the Equal Employment Opportunity Commission alleging racial discrimination on the part of both defendants for events dating back as far as 1985.[3] (Compl.¶ 28.) The EEOC investigated these claims and was unable to conclude that a violation had occurred. (*Id.* ¶ 29.) A "right-to-sue" letter was issued, and Byrd filed suit in this court on February 22, 1999. (*Id.*)

On March 11, 1999, plaintiff was demoted from paperhandler foreman to paperhandler. (*Id.* ¶¶ 31–32.) Glenn Davis, one of Byrd's supervisors, gave Byrd a letter indicating he was being demoted "due to his continuing failure to support and follow simple management directives." (Demotion Letter, Sun's Mem., Ex. 6.) On March 18, 1998, Byrd filed a grievance with the Union protesting his demotion. Byrd's temporary replacement as night-shift paperhandler foreman was Phyllis Asbury, an African–American woman who was transferred from another Sun department that was downsizing. (Davis Dep., Sun's Mem. Ex. 1 at 105–06.) After a brief period of time, Asbury requested to be removed from the supervisory position of foreman because she did not feel she was capable of performing the job. Asbury was demoted to paperhandler and replaced as foreman by Donald Green, who is also African–American. (*Id.* at 108–09.)

**1.** Byrd's original complaint in this lawsuit was dismissed because he failed to present a *prima facie* case of discrimination, harassment, or retaliation. *See Byrd v. The Baltimore Sun Co.*, No. Civ. JFM–00–2677, 2001 WL 741843, at *2 (D.Md. June 25, 2001). Byrd appealed that decision to the Fourth Circuit Court of Appeals. During pendency of that appeal, the Supreme Court rendered its decision in *Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), making it clear that a plaintiff alleging discrimination under Title VII need not plead the elements of a *prima facie* case in order to survive a motion to dismiss. *Id.* at 511–12, 122 S.Ct. 992. The Court of Appeals vacated the original dismissal of Byrd's claim and remanded to this court. *Byrd v. The Baltimore Sun,* No. 43 Fed.Appx. 702, 703 (4th Cir.

2002) (unpublished opinion). After remand, I granted Byrd leave to file a third amended complaint. Both sides have now conducted extensive discovery on all of Byrd's claims.

**2.** Plaintiff was a member of the Union from 1979 until his membership was terminated for failure to pay dues in 2000.

**3.** Most of these charges became the subject of a previous lawsuit that was dismissed by this court. *See Byrd v. The Baltimore Sun,* 230 F.3d 1351 (4th Cir.2000) (unpublished opinion). For purposes of the present suit, the significance of the allegations is the date on which charges were filed with the EEOC, not the substance of those allegations.

On May 5, 1999, Sun representatives and the Union conducted a meeting to grieve Karl Byrd's demotion.[4] At this time, The Sun detailed eight reasons for Byrd's demotion, including a failure to follow specific procedures, unauthorized early departures from the workplace, and a failure to attend or arrive on time for staff meetings. The reasons provided by The Sun's management were recorded by union representatives at this meeting. (Joint Standing Committee Mem., Sun's Mem. Ex. 7.) On May 20, 1999, those reasons were conveyed to Byrd by Robert Stallings, the Union president. (Compl. ¶ 41.)

On June 16, 1999, Byrd suffered an outbreak of hives, allegedly brought on by the stress of his work environment. (*Id.* ¶ 50.) After receiving medical attention for the hives, Byrd took a leave of absence from work at the behest of Dr. Beran, the psychiatrist Byrd had been seeing since his demotion in March. Byrd remained on this leave of absence for four months. In a note dated October 12, 1999, Dr. Beran indicated that Byrd was being treated for "major depression, with agitation and somatization," that he "may not be able to tolerate the work environment at this time," but that "nevertheless, patient believes it is worth putting forth the effort." (Sun's Mem. Ex. 16.) Byrd returned to work on October 13, 1999.

The Sun claims that Byrd arrived at work that evening trumpeting his return and making other loud comments regarding the deterioration of the work environment since his departure. (Email from Larry Bowers to Glenn Davis, Sun's Mem. Ex. 12.) Sun management found Byrd's conduct inappropriate and wished to address their concerns to him. When Byrd returned to work the next evening, Davis asked to meet with plaintiff in Davis's office. Byrd, concerned about his health and potential impact upon his pending case against The Sun, refused to meet with Davis and demanded to know the subject matter of the meeting. (Byrd Dep., Sun's Mem. Ex. 2 at 105–12.) Davis assured plaintiff that the discussion would not touch upon matters involving his pending lawsuit. (Davis Dep., Sun's Mem. Ex. 1 at 132–33.) Byrd, nevertheless, refused to attend this meeting with his supervisor. A short time later, Byrd was escorted from the building.

After meetings between Byrd, union representatives, and Sun management on October 18 and October 20, 1999, Byrd was officially suspended from work for five days for his refusal to attend the meeting requested by Davis. (Letter of Suspension, Sun's Mem. Ex. 13.) In the letter of suspension, dated October 21, 1999, Byrd was informed that "further unsatisfactory conduct" could result in "more severe disciplinary action, including discharge and termination of your employment with The Baltimore Sun." (*Id.*)

Byrd immediately took another medical leave of absence. The Sun requested documentation verifying the need for medical leave. Byrd provided a letter from his psychiatrist, Dr. Beran, explaining Byrd's disability. The note simply indicated Byrd was "not able to work at this time." (Sun's Mem. Ex. 14.) Pursuant to the union contract between The Sun and its employees, The Sun asked Byrd to see a physician of The Sun's choosing to verify the need for the requested sick leave. On November 22, 1999, Byrd met for one hour with Dr. James P. McGee, Director of Psychology for the Sheppard Pratt Health System. Dr. McGee agreed with Dr. Beran that Byrd was unable to work, indicat-

---

4. On May 1, 1999, Byrd filed a second set of charges with the EEOC alleging he had been demoted in retaliation for his previous filings with the EEOC and this court.

ing Byrd suffered from "severely disabling and possibly psychotic levels of mental illness." (Dr. McGee's Report, Sun's Mem. Ex. 15.) McGee further opined that Byrd's "medical condition is permanently disabling and he is unlikely to be able to return to work in any capacity." (*Id.*) Byrd's leave request was granted.

On February 8, 2000, Byrd desired to return to work and presented The Sun with a note from Dr. Beran (identical to the note presented in October 1998) indicating that Byrd "may not be able to tolerate the work environment at this time," but that "nevertheless, patient believes it is worth putting forth the effort." (Sun's Mem. Ex. 16.) The Sun refused to allow Byrd to return to work. Byrd then supplemented his note from Beran with another note from Beran, dated February 28, 2000, indicating Byrd's return to work presented no risks. (Sun's Mem. Ex. 17.) The Sun, faced with inconsistent reports, asked Byrd to return to Dr. McGee for a new evaluation. (Letter from Howard Kurman, Esq. to Ralph Byrd, Esq. of 3/1/00, Sun's Mem. Ex. 18.) Byrd informed The Sun he would not attend the scheduled appointment. (Letter from Ralph Byrd, Esq. to Howard Kurman, Esq. of 3/16/00, Sun's Mem. Ex. 19.) The Sun responded by informing Byrd that his refusal or failure to attend the appointment would be done "at his own peril" and that any employment decisions would be based upon the medical information in The Sun's possession at that time. (Letter from Howard Kurman, Esq. to Ralph Byrd, Esq. of 3/16/00, Sun's Mem. Ex. 20.)

Byrd did not attend the appointment with Dr. McGee and was subsequently terminated. (Termination Letter, Sun's Mem. Ex. 21.)

## II.

### A. Discrimination Based Upon Race

■■■ Plaintiff alleges discriminatory discipline and termination. Absent direct evidence of discrimination, plaintiff's racial discrimination claims are subject to the familiar burden-shifting proof scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[5] To prove discriminatory discipline, plaintiff must establish that (1) he was a member of a protected class; (2) the prohibited conduct in which he was engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) the disciplinary measures enforced against him were more severe than those enforced against other employees. *See Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1228 (4th Cir.1998); *Middleton v. Frito-Lay, Inc.,* 68 F.Supp.2d 665, 668 (D.Md. 1999). In the context of a termination, plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was qualified for his job and his performance was satisfactory; (3) he was terminated; and (4) other employees who were not members of the protected class were retained under apparently similar circumstances. *See Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir.1995).

---

5. In his opposition to defendants' motions for summary judgment, plaintiff directs attention away from his earlier claims of racial discrimination and asserts that his "Third Amended Complaint is grounded on allegations that Plaintiff was harassed, demoted, suspended, and terminated *all in retaliation*" for actions he took to protect his rights under Title VII.

(Pl.'s Opp. at 1 n. 2 (emphasis added).) The arguments in plaintiff's opposition are addressed entirely to a claim of retaliation under Title VII. Defendants have, nonetheless, addressed all possible claims, including those of racial discrimination and a hostile work environment. I will, therefore, briefly address these claims as well.

■ If the plaintiff establishes a *prima facie* case the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for the action taken. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant's burden at this point is not one of persuasion, but merely one of production. *See id.* If the employer successfully proffers such an explanation, the burden returns to the plaintiff to show that the proffered reason or reasons are a pretext for impermissible discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio,* 53 F.3d 55, 57–58 (4th Cir. 1995).

■ Plaintiff has failed to establish a *prima facie* case of discriminatory discipline or termination. Plaintiff was unable to identify a single person that was treated differently in circumstances comparable to his, much less a person outside of the class. (Byrd Dep., Sun's Mem. Ex. 2 at 71–72, 78–80, 118–19.) Plaintiff's inability, at the close of discovery, to find a comparable situation in which a person outside the protected class was treated differently makes it impossible to raise an inference of impermissible discriminatory conduct on the part of the defendants under *McDonnell Douglas. See DeJarnette v. Corning, Inc.,* 133 F.3d 293, 298 (4th Cir.1998) (reversing a jury determination on liability in part because plaintiff "failed to identify any similarly situated employees who were treated differently.")

■ Assuming *arguendo,* that the plaintiff could make out a *prima facie* case of discrimination, The Sun has provided various legitimate, nondiscriminatory reasons for plaintiff's demotion, suspension, and termination. (Sun's Mem. Exs. 6, 13, 21.) Plaintiff has failed to rebut this evidence with proof that the reasons given by his employer are pretextual. Plaintiff's belief that the actions taken against him were motivated by race is insufficient to raise a genuine issue of material fact. *See Williams v. Cerberonics,* 871 F.2d 452, 456 (4th Cir.1989). Based on the record, no reasonable jury could find that plaintiff had been impermissibly discriminated against on the basis of his race by either The Sun or the Union.[6]

### B. Hostile Work Environment

■ Plaintiff's hostile work environment claim is similarly unsupported by the evidence. To state a claim for hostile work environment, plaintiff must show that (1) the harassment was unwelcome; (2) the harassment was based on race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Causey v. Balog,* 162 F.3d 795, 801 (4th Cir.1998). Plaintiff has failed to allege or offer any instances of harassment based upon his race. There is nothing in the record suggesting that any harassment based on race occurred, much less rose to a level that was sufficiently severe or pervasive to alter the conditions of plaintiff's employment. *See Hawkins v. PepsiCo, Inc.,* 203 F.3d 274 (4th Cir.2000) (affirming summary judgment on hostile work environment claim where plaintiff relied on same evidence for unsuccessful claim of race discrimination). Plaintiff points to his demotion and suspension as hostile acts that created an abusive atmosphere. No ad-

---

**6.** Plaintiff's claims under 42 U.S.C. § 1981 are subject to the same proof scheme as his Title VII claims. Accordingly, summary judgment will be granted on those claims as well.

missible evidence exists, however, suggesting any of these actions were taken on account of plaintiff's race.[7] To the extent The Sun created an abusive atmosphere in retaliation for the protected activities engaged in by the plaintiff, the claim of a hostile work environment is subsumed under plaintiff's retaliation claim.

## C. Retaliation

■■■■■ Plaintiff's remaining arguments are focused upon the alleged retaliatory activities of the defendants. To establish a *prima facie* case of retaliation, plaintiff must demonstrate that: (1) he engaged in protected activity; (2) the employer took adverse action; and (3) a causal connection existed between the protected activity and the adverse action. *See Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir.1997); *Nichols v. Harford County Bd. of Ed.*, 189 F.Supp.2d 325, 343 (D.Md. 2002). After the plaintiff has established a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *See Beall*, 130 F.3d at 619; *Nichols*, 189 F.Supp.2d at 343. If the defendant raises a genuine issue of fact, then the burden shifts back to the plaintiff to prove retaliation by demonstrating that the employer's reason or reasons are pretextual. *See Beall*, 130 F.3d at 619; *Nichols*, 189 F.Supp.2d at 344.

■■■■ Plaintiff has established a *prima facie* case of retaliation under Title VII. It is undisputed that plaintiff engaged in protected activity and that The Sun took adverse action against the plaintiff. Plaintiff relies on the timing of the demotion compared with the filing of EEOC charges to prove the causal connection. Plaintiff filed charges with the EEOC in August 20, 1998 and was demoted on March 11, 1999. Though this is not strong evidence of a causal connection, the plaintiff's burden at this stage is not an onerous one. *See Williams*, 871 F.2d at 457.

The Sun contends it demoted plaintiff before it learned of plaintiff's first suit against the company, which would indicate there was no causal connection. Plaintiff has provided letters from The Sun's attorney, however, indicating the company was aware of the charges filed with the EEOC as early as September 8, 1998. (*See* Pl.'s Opp. Ex. 1.) The filing of charges with the EEOC constitutes protected activity. *See Karpel*, 134 F.3d at 1229. The date on which the suit based on those charges was filed is irrelevant in establishing a causal connection between the filing of charges and an alleged retaliatory action. Plaintiff is entitled to all reasonable inferences that may be made in his favor, and an inference that may be drawn from the temporal proximity of the demotion with the filing of charges is that a causal connection exists. *See McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991) (holding that eight months between charges and dismissal created inference of causal connection); *Williams*, 871 F.2d at 457.

---

7. Plaintiff offers an affidavit from David Hyler as proof that actions taken by the defendant were based on plaintiff's race. The testimony provided within the affidavit is inadmissible hearsay. *See* Fed.R.Evid. 801, 802. In the affidavit, Hyler swears that Ed Kiehl told him that Glenn Davis allegedly made comments regarding Byrd at Kiehl's interview for a job within the paperhandler's department. Significantly, Kiehl is apparently unwilling to corroborate the conversation. (*See* Stallings Dep., Pl.'s Opp. Ex. 14 at 36.) The rules of evidence are designed to exclude such unreliable hearsay. The affidavit will not be considered. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir.1995) (affidavits and depositions based on hearsay are "neither admissible at trial nor supportive of an opposition to a motion for summary judgment.").

The Sun has responded by articulating legitimate, nondiscriminatory reasons for the adverse actions taken against plaintiff. Plaintiff's demotion is explained in the letter plaintiff received at the time of his demotion. (Sun's Mem. Ex. 6.) The reasons for the demotion were more fully explained at the request of the Union when the Union grieved the demotion. (Sun's Mem. Ex. 7.) The details surrounding plaintiff's suspension are documented in an email that was sent from Larry Bowers to Glenn Davis on the night plaintiff returned from his sick leave (Sun's Mem. Ex. 12) and in the notice of suspension (Sun's Mem. Ex. 13). The events leading up to plaintiff's termination are well-documented by the notes from Dr. Beran (Sun's Mem. Exs. 14, 16, 17), the report from Dr. McGee (Sun's Mem. Ex. 15), and the letters between the parties' respective attorneys prior to plaintiff's dismissal (Sun's Mem. Exs. 18, 19, 20). Thus, the burden returns to the plaintiff to prove that the reasons provided by the employer are pretextual.

▮ Plaintiff fails to meet that burden. Plaintiff raises a number of questions he believes remain unanswered based on the current record. These allegedly unanswered questions, however, do not create the inference that the reasons provided by the defendant for the various adverse employment actions are false. For instance, plaintiff asks why the reasons given by The Sun in the demotion letter of March 11, 1999 are not as detailed as the reasons provided to the Union at the grievance regarding the demotion on May 5, 1999. The fact that The Sun more fully elucidated the reasons for the demotion when asked to explain its actions in a grievance proceeding raises no inference that the reasons provided at the proceeding are false. (*See* Davis Dep., Sun's Mem. Ex. 1 at 98–102.) The reasons provided are more detailed, but they do not contradict the initial, abbreviated version provided to the plaintiff in the demotion letter.[8]

Plaintiff also contends that someone other than Glenn Davis initiated the demotion, suspension, and termination, and therefore can provide the "real" reasons for these actions. The involvement of other management personnel in the disciplinary/termination process does not prove anything. Davis had to keep his supervisor and others within management informed of activities within the pressroom. (*See* Davis Dep., Pl.'s Opp. Ex. 3 at 85, 147.) Davis asked for assistance from various personnel in The Sun's human resources department prior to taking employment action against plaintiff. For instance, Jack Wilson helped Davis draft the demotion letter because Davis lacked experience in this area. (*See id.* at 95–96.) That Davis sought counsel from those more experienced in employee relations is unremarkable and does not raise any inference that the reasons Davis provides for the adverse employment actions are pretextual.[9]

---

**8.** The alleged suddenness of plaintiff's demotion sheds little, if any, light on whether the reasons for the demotion provided by the employer are false. Plaintiff attempts to create an inference his demotion was retaliatory from the fact his replacement was not lined up prior to his demotion. No such inference arises. There are a number of plausible explanations, which do not involve employer duplicity, for not having plaintiff's replacement available at the time of plaintiff's demotion.

**9.** There are several motions, two from plaintiff and one from The Sun, regarding the authenticity of the employment action letters signed by Glenn Davis and the alleged need to take the depositions of the "real" authors. There is nothing in the record indicating these documents are not authored by Davis (albeit with some assistance from human resources personnel) or that Davis is not the

Plaintiff also alleges that The Sun went "out of its way" to replace him with another African–American. His initial replacement was Phyllis Asbury, an African–American, who eventually asked to be demoted to paperhandler because she felt she was not qualified for the job. (*See* Asbury Dep., Pl.'s Opp. Ex. 8 at 14.) Donald Green, an African–American who moved into the position after Asbury, testifies he was told by Barbara Jones, The Sun's human resources manager, that he was hired in part because he is a minority. (*See* Green Dep., Pl.'s Opp. Ex. 7 at 16.) Assuming Green's testimony to be accurate for purposes of this motion, The Sun's hiring decisions in the weeks *after* plaintiff's demotion do not reveal anything about the veracity of the reasons for that demotion. The Sun's alleged desire to place a minority in plaintiff's position after his demotion provides no support for the theory that plaintiff was demoted in retaliation for protected activities. Furthermore, plaintiff postulates a complex plan whereby The Sun decided to discriminate against plaintiff based on his race and immediately engaged in a convoluted scheme of reverse discrimination to avoid liability. This scenario requires a number of unreasonable inferential leaps, is simply not plausible, and does not prove that The Sun's proffered reasons for the demotion are pretextual.

The remainder of plaintiff's contentions regarding unanswered questions he be-

lieves raise a genuine issue of material fact are either duplicative of the issues discussed above or do not warrant extensive discussion. Plaintiff's arguments regarding his suspension focus on whether plaintiff had done anything inappropriate on October 13, 1999. Plaintiff fails to recognize that he was suspended for refusing to attend the meeting requested by his supervisor on October 14, 1999 and *not* for the allegedly loud, disruptive behavior of the previous evening. (*See* Notice of Suspension, Def.'s Mem. Ex. 13.) As for plaintiff's termination, the doctors' reports and the letters between the attorneys speak for themselves.[10] The Sun had reports from two doctors indicating plaintiff was unable to work. (Def.'s Mem. Ex. 14, 15) When one of those doctors suddenly changed his assessment and The Sun wanted a re-evaluation from its own doctor, plaintiff flatly refused to attend the appointment. (Def.'s Mem. Ex. 19.) The Sun had warned plaintiff of the consequences of his refusal and was left with little choice but to terminate him. Plaintiff is unable to establish a claim of retaliation against The Sun under the *McDonnell Douglas* proof scheme.

### D. Claims Against the Union

Plaintiff's claims of discrimination and retaliation against the Union stumble and fall upon the same evidentiary hurdles as his claims against The Sun. To the extent plaintiff's claims against the Union

---

member of the management team that initiated the adverse employment actions taken against plaintiff. As with the depositions of Bruce McEntee and Michael Waller, addressed in a previous order, plaintiff has failed to demonstrate that the information he seeks to obtain through the depositions he now requests are at all material to the issues presented in this case. Plaintiff's motions to strike materials submitted in support of defendants' motion for summary judgment and for a continuance to obtain further discovery will

be denied. Defendant Sun's motion for a protective order will be denied as moot.

10. In his motion to strike materials submitted in support of defendants' motion for summary judgment, plaintiff claims Dr. McGee's report was not authored by him. There is no basis in the record for this assertion. He also questions the admissibility of the letters between the attorneys. All of this evidence is authentic, relevant, and admissible. Accordingly, plaintiff's motion will be denied.

are that it acquiesced to the discriminatory and retaliatory conduct of The Sun, the Union cannot be held liable for acquiescing to discriminatory and retaliatory conduct that plaintiff has failed to establish occurred.

 Plaintiff also alleges that the Union itself engaged in discrimination and retaliatory conduct by not representing his interests as diligently as that of other union members. Plaintiff's accusations are wholly unsupported in the record. Plaintiff's own testimony notwithstanding, the only evidence offered to support allegations of Union misconduct is a section of deposition testimony from Robert Stallings and some impressions Donald Green had of union representatives' attitude toward plaintiff.

When Stallings deposition testimony, in which he apparently cannot recall ever taking any action on plaintiff's behalf, is placed in context, it becomes clear that he is simply asking for greater specificity in the questioning. (*See* Stallings Dep., Pl.'s Opp. Ex. 14 at 24–29.) Stallings and the Union took many steps on plaintiff's behalf, including grieving his demotion and conducting two meetings with management to address his suspension—despite the fact that plaintiff did not apparently follow proper protocol for obtaining the Union's assistance. (*See id.* at 24–26.) The Union's decision not to pursue these issues further is a reflection of their merit as arbitrable issues and not evidence of discrimination or retaliation.

Green's perception that the Union and The Sun were somehow working together to end plaintiff's employment is based primarily upon one comment he overheard Robert Stallings make to Glenn Davis. On the day plaintiff was escorted from the building after refusing to meet with Davis in his office, Stallings allegedly told Davis that Davis was "messing his case up."

(Green Dep., Pl.'s Opp, Ex. 7 at 33.) This comment, assuming it was made, is hardly evidence of a plot to eliminate plaintiff and could just as easily be construed as Stallings effort to persuade Davis to reverse course regarding plaintiff's suspension.

Plaintiff provides no evidence that other union members were treated differently in similar circumstances. No reasonable jury could find that the Union discriminated or retaliated against plaintiff in violation of Title VII or § 1981.

A separate order is being entered herewith.

## AMENDED ORDER

For the reasons stated in the accompanying memorandum, it is, this 29th day of August 2003,

ORDERED that

1. Plaintiff's motion for a continuance to obtain further discovery is denied;

2. Plaintiff's motion to strike materials submitted in support of summary judgment is denied;

3. The Baltimore Sun's motion for protective order is denied as moot;

4. The Baltimore Sun's motion for summary judgment is granted;

5. The Baltimore Graphic Communications Union's motion for summary judgment is granted;

6. Judgment is entered in favor of the defendants; and

7. This case is closed.