Wanda KESS

v.

**MUNICIPAL EMPLOYEES CREDIT UNION OF BALTIMORE, INC.**

No. CIV. CCB–03–1975.

United States District Court,
D. Maryland.

May 26, 2004.

Norris C. Ramsey, Norris C. Ramsey, PA, Baltimore, MD, for Plaintiff.

Craig F. Ballew, Tracey Dallahan McLauchlin, Ferguson Schetelich and Ballew, PA, Baltimore, MD, for Defendant.

## *MEMORANDUM*

BLAKE, District Judge.

Defendant Municipal Employees Credit Union of Baltimore, Inc. has moved for summary judgment against the plaintiff, Wanda Kess. The issues in this motion have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons stated below, the motion for summary judgment will be granted.

## BACKGROUND

Defendant Municipal Employees Credit Union of Baltimore, Inc. ("MECU") is a federally-insured credit union which provides financial services to employees of the City of Baltimore. During 1999 and 2000, MECU implemented a plan to open three new branches around Baltimore. Four employees of MECU were responsible for creating a new branch manager position and supervising the new branch managers: CEO Bert Hash, COO Andrew Pataki, Vice President of Branch Operations Patricia Roberts, and Vice President of Human Resources Warren Wilson.[1] On April 17, 2000, plaintiff Wanda Kess ("Kess") was offered and accepted the position of Branch Manager for the new MECU Falstaff branch.[2] Kess was employed in this position until August 29, 2002, when she was terminated, after being placed on paid leave six days earlier. The same four members of the MECU management team also were involved in the decision to terminate Kess. In this suit, Kess alleges race discrimination regarding her compensation, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), sex discrimination regarding her compensation and retaliation, in violation of Title VII, and age discrimination in her termination, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA").

When Kess was hired by MECU in 2000, she had a high school diploma, the equivalent of approximately one year of college credits, and over twenty-five years of experience working for several banks in different capacities. She had held a supervisory position for nine years, and had direct responsibility for the operations of a branch for five years. Kess testified that she was informed prior to her interview with MECU that the starting salary for the branch manager position would be $40,000 for those without experience and $44,000 for those with experience.[3] (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 34–35, 43.) In response to questions from Kess, Warren Wilson told her that the salary was not negotiable and already took into account her prior experience. (*Id.*) Kess was offered and accepted the position at a starting salary of $44,000.[4]

MECU hired four other branch managers during the period between 1999 and 2001, starting with Frank Ciesla in August 1999.[5] Ciesla had a college degree, was completing a master's degree, and had al-

---

1. Hash and Wilson are African–American males. Pataki is a white male. Roberts is an African–American female. These four employees formed the MECU management team during the relevant time period.

2. Kess is an African–American female born on July 27, 1952.

3. MECU states that it set the overall salary range for the branch manager position at $40,000 to $75,000. (Def.'s Mem. at Ex. 1, Wilson Aff., at ¶ 6.)

4. Kess received a 4.25 percent annual raise in April 2001 (to $45,870), and in April 2002 she received a six percent annual raise (to $48,622).

5. Ciesla is a white male.

most twenty years of experience as a regional manager of branch banking. He negotiated a starting salary of $48,000. Ciesla was hired with the expectation that he would oversee the opening of the new branches, serving as the initial manager as each new branch opened.[6] (Def.'s Mem. at Ex. 1, Wilson Aff., at ¶ 8.)

MECU then hired Desiree Stafford as a branch manager on November 3, 1999 and John Vassallo on April 25, 2000, along with Kess.[7] Stafford and Vassallo were offered and accepted a starting salary of $44,000.[8] Like Kess, they had considerable experience working for banks or credit unions, and had at least some experience working as a branch supervisor. Also like Kess, Stafford did not have a college degree. Vassallo left the position with MECU within his first year on the job, after he was offered a higher-paying position with his former employer. MECU then hired John Godwin as the fourth branch manager in 2001.[9] Godwin had a college degree and a master's degree in business administration, and had been the CEO of a small credit union for several years. Godwin negotiated a starting salary of $48,000.

Members of the MECU management team and employees who worked under Kess at the Falstaff branch testified about a variety of ongoing problems during Kess's tenure at the branch, which many of them attributed to her negative leadership style, poor communication skills, and inappropriate treatment of staff. (Id. at Ex. 3, Roberts Aff., at ¶ 3–4, 6–7, 9–10; id. at Ex. 4, Pataki Aff., at ¶ 7–8; id. at Ex. 5, Smith Aff., at ¶ 5–9; Pl.'s Opp. Mem. at Ex. 1c., Rouse Dep., at 17–18, 21–36; id. at Ex. 1d., Hardy Dep., at 5–7, 15–17, 20–25, 41; id. at Ex. 1g., Harrison Dep., at 5–11, 23–25; id. at Ex. 1h., Tyler Dep., at 5–11, 14–15, 17–18, 21–22.) In early 2002, Lelieth Bagwandeen, an assistant manager working under Kess at the Falstaff branch, informed MECU management that she did not want to work under Kess any longer, even if this required a demotion. (Def.'s Mem. at Ex. 3, Roberts Aff., at ¶ 7; id. at Ex. 6, Bagwandeen Dep., at 5–6.) Between February and May 2002, MECU sent employee Glenda Smith, an African–American female, to the Falstaff branch to make observations and recommendations about how to improve the branch. (Id. at Ex. 5, Smith Aff., at ¶ 4.) Smith reported back that employee morale was very low, Kess did not have good communication or interactions with her staff, and staff reported feeling belittled, upset, confused, and frustrated because of Kess. (Id. at ¶ 5–10.)

Kess's termination followed a specific incident at the Falstaff branch on August 23, 2002. Jowanna Rouse, a teller working under Kess at the branch, testified that Kess was visibly angry when she arrived that morning, and began yelling at several branch employees. (Pl.'s Opp. Mem. at Ex 1c., Rouse Dep., at 36–42.) Rouse and

---

**6.** Ciesla received a 3.75 percent annual raise in August 2000 (to $49,800), a 6.26 percent annual raise in August 2001 (to $52,917), and a five percent annual raise in August 2002 (to $55,561). Warren Wilson testified that part of the raise in 2001 was to compensate for parking expenses, because Ciesla was working at the only MECU branch without parking. (Pl.'s Opp. Mem. at Ex. 1f., Wilson Dep., at 10.) Ciesla also received a bonus in 2000 of $2,500 for opening up the MECU branches. (Id.)

**7.** Stafford is an African–American female. Vassallo is a white male.

**8.** Stafford received two annual raises totaling approximately 9 percent for the years 2000 and 2001 (to $47,933 in 2001), and in 2002 she received an annual raise of six percent (to $50,800).

**9.** Godwin is a white male.

several other employees went to Pamela Hardy, the assistant branch manager, and threatened to quit because of the way that Kess was treating them. (*Id.* at 38–42; *id.* at Ex. 1d., Hardy Dep., at 32–34, 38–39.) Hardy then contacted Patricia Roberts to report these complaints. (*Id.* at 39; Def.'s Mem. at Ex. 3, Roberts Aff., at ¶ 11.) Roberts, Andrew Pataki, and Warren Wilson decided to place Kess on paid administrative leave, pending an investigation of the incident. (*Id.* at Ex. 3, Roberts Aff., at ¶ 11–12; *id.* at Ex. 4, Pataki Aff., at ¶ 9.) Roberts and Pataki traveled to the Falstaff branch later that day to convey the allegations and their decision to Kess. (*Id.* at Ex. 3, Roberts Aff., at ¶ 12–13; *id.* at Ex. 4, Pataki Aff., at ¶ 9–10.)

Warren Wilson then interviewed employees at the Falstaff branch about Kess's behavior. (*Id.* at Ex. 1, Wilson Aff, at ¶ 13.) According to Wilson, the employees confirmed the initial reports of the August 23 incident, and reported more generally that Kess had been intimidating, belittling, disparaging, and retaliating against employees working under her, and openly disparaging MECU. (*Id.*) Wilson reported his findings to the other members of the MECU management team on August 28, and they all agreed that Kess's reported conduct warranted termination. (*Id.* at ¶ 14–15; *id.* at Ex. 3, Roberts Aff., at ¶ 14; *id.* at Ex. 4, Pataki Aff., at ¶ 11–12.) Kess was formally notified of her termination on August 29, 2002. After Kess's termination, Glenda Smith was promoted to become the branch manager of the Falstaff branch.[10] Smith had been employed by MECU in various capacities since 1977. When she took over Kess's position as branch manager in 2002, Smith was earning $53,926 annually, which included a merit increase of 4.86 percent because she was promoted into the position.

Kess cites two examples in which she complained about the use of racially-charged language in the workplace at the Falstaff branch. In July 2001, in conversations with Kess, Patricia Roberts referred to a new teller at the Falstaff branch as "poor white trash" and disparaged the teller for coming from Dundalk. (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 58–63, 66–67.) Kess testified that Roberts made this comment to her twice in a span of about two weeks; Roberts admitted that she made the comment on one occasion. (*Id.* at 58, 61; Def.'s Mem. at Ex. 3, Roberts Aff., at ¶ 15.) Between July 2001 and January 2002, Kess complained to Roberts and to Andrew Pataki and Bert Hash about the "poor white trash" comment. (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 65–72.) Roberts apologized to Kess in January 2002. (*Id.* at 71–72.) The second incident occurred around July 2002, when two of the tellers at the Falstaff branch referred to each other using the word "nigger." (*Id.* at 73–77; *see also id.* at Ex. 1d., Hardy Dep., at 18–20.) Kess was not present when the comments were made, but the incident was reported to her, and she subsequently was involved in reporting the incident to Warren Wilson and Patricia Roberts and in disciplining the two employees. (*Id.* at Ex. 1b., Kess Dep., at 74–77, 91–92; *id.* at Ex. 1d., Hardy Dep., at 18–20.)

Prior to Kess's termination, both Desiree Stafford and Kess had complained to MECU management about their salaries being lower than those of the other two branch managers, John Godwin and Frank Ciesla. Stafford met with the four members of the MECU management team to discuss the issue. Kess testified that she raised the salary disparity issue with Bert

10. As noted, Smith is an African–American female. She was born on April 30, 1960.

Hash, Andrew Pataki, and Patricia Roberts individually on several occasions, up through August 2002, complaining that it was discriminatory. (*Id.* at Ex. 1b., Kess Dep., at 78–82.) Roberts stated that Stafford was more vocal than Kess in complaining about the salary disparity issue. (Def.'s Mem. at Ex. 3, Roberts Aff., at ¶ 17–18.) Stafford remains employed as a branch manager with MECU.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Kess claims that she was subject to race, sex, and age discrimination and retaliation in violation of Title VII, 42 U.S.C. § 1981, and the ADEA. A plaintiff may defeat a defendant's motion for summary judgment and establish a claim for intentional race, sex, or age discrimination or retaliation through either the "mixed-motive" or "pretext" methods of proof. *See, e.g., Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir.2004) (en banc). Under the mixed-motive method, a plaintiff avoids summary judgment by introducing sufficient direct or circumstantial evidence for a reasonable jury to conclude that an impermissible factor actually motivated an adverse employment decision. *See id.* at 286; *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).[11] Kess

---

11. The Fourth Circuit has assumed that a plaintiff pursuing a mixed-motive case under the ADEA cannot rely upon circumstantial evidence alone, and is required to introduce some *direct* evidence of an impermissible motivation, even after the 1991 Civil Rights Act.

does not seek to invoke the mixed-motive method of proof, but instead relies exclusively on the traditional pretext method. In any event, the discussion below demonstrates that Kess has not presented sufficient evidence for a reasonable jury to conclude that race, sex, age, or retaliation was a motivating factor in any adverse employment action by MECU. *Cf. Love–Lane v. Martin,* 355 F.3d 766, 786–87 (4th Cir.2004).

Under the traditional "pretext" method of proof, a plaintiff establishes her claim under the burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Hill,* 354 F.3d at 283, 285 (stating that ADEA claims can be analyzed under the *McDonnell Douglas* framework); *Love–Lane,* 355 F.3d at 786 (same for § 1981 claims); *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 650 (4th Cir.2002) (same for retaliation claims). Once the plaintiff establishes a prima facie case of unlawful discrimination or retaliation, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Hill,* 354 F.3d at 285. If the defendant articulates such an explanation, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for impermissible discrimination. *Id.*

"At this point, the burden to demonstrate pretext 'merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). To survive summary judgment, the plaintiff must show that the defendant's non-discriminatory explanation is "unworthy of credence" or offer "other forms of circumstantial evidence sufficiently probative" of discrimination or retaliation. *Mereish v. Walker,* 359 F.3d 330, 336 (4th Cir.2004). The plaintiff must present admissible evidence that is more than self-serving opinions or speculation. *See McCain v. Waste Mgmt., Inc.,* 115 F.Supp.2d 568, 574 (D.Md.2000).

## I.

▮ Kess claims that she was compensated less than white male branch managers performing the same job, because of her race and sex.[12] To establish a prima facie case of race or sex discrimination in compensation under Title VII, a plaintiff must prove that (1) she is a member of a protected class; (2) she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job. *Gbenoba v. Montgomery County Dep't of Health & Human Servs.,* 209 F.Supp.2d 572, 579 (D.Md.2002); *Chika v. Planning Research Corp.,* 179 F.Supp.2d 575, 583–84 (D.Md. 2002).[13] It is undisputed that Kess and

*See Hill,* 354 F.3d at 285 n. 2. Because Kess has not produced sufficient evidence, either direct or circumstantial, to pursue a mixed-motive case, I do not need to reach this issue.

**12.** In her complaint, Kess also alleges that MECU engages in a "pattern and practice" of race discrimination regarding job assignments and pay. (Compl. at ¶ 5.) Kess is limited to the scope of the charge that she filed with the EEOC, however, *see Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 132–33 (4th Cir.2002), and the charge nowhere alleges a pattern or practice of discrimination. The court will not consider this allegation.

**13.** A claim of sex discrimination in compensation also could be brought under the Equal Pay Act, 29 U.S.C. § 206(d), based on the same prima facie elements. *See Jordan v. CSX Intermodal, Inc.,* 991 F.Supp. 754, 759 n. 10 (D.Md.1998). Kess does not raise an Equal Pay Act claim in her complaint.

Desiree Stafford, African–American females, were compensated less than Frank Ciesla and John Godwin, white males, and that all four held the same title of Branch Manager for MECU at the same time. The record also reflects that Glenda Smith, an African–American female, earned less than Frank Ciesla when she took over as the Falstaff branch manager in 2002.[14] This is sufficient to establish a prima facie claim of race and sex discrimination in compensation.[15]

■ MECU has responded with legitimate, non-discriminatory reasons for the salary disparities. MECU states that Ciesla and Godwin were able to negotiate a higher starting salary because they had significantly more management experience and education than either Kess or Stafford. (Def.'s Mem. at 14–16; see also Pl.'s Opp. Mem. at Ex. 1f., Wilson Dep., at 11, 13–14.) Wilson testified that if MECU wanted a particular candidate badly enough, based on the skills and value that the individual would bring to the company, then the company would negotiate to get the individual "for whatever it takes." [16] (Pl.'s Opp. Mem. at Ex. 1f., Wilson Dep., at 11–12, 14.) Wilson also noted that Smith's salary cannot be compared to the other branch managers, because she worked her way up through the company over many years. (Id. at 19–22.) The evidence in the record, undisputed by Kess, supports these explanations for the salary dispari-

ties. Ciesla and Godwin both had college degrees, and had or were in the process of completing master's degrees. Ciesla had almost twenty years of experience managing bank branches, and Godwin had served as the CEO of a credit union for several years and had a graduate degree in business administration. Kess and Stafford, on the other hand, did not have college degrees, and Kess had only five years of experience in branch management. As for Smith, she started with MECU in a clerical position in 1977, and eventually was promoted to the branch manager position in 2002–unique circumstances compared to the other branch managers.

■ Kess has failed to establish that these non-discriminatory explanations are "unworthy of credence." Mereish, 359 F.3d at 336. She does not dispute that Ciesla and Godwin had greater experience and skills, or offer any evidence to contradict Wilson's testimony that the starting salaries were based on these factors. Kess instead responds by attacking the merits of MECU's explanation, suggesting that these factors should not be relevant because all of the branch managers performed the same duties, and arguing that she actually performed better than Ciesla and Godwin. These arguments do not raise a genuine issue of material fact. It is not the province of the courts "to decide whether the reason was wise, fair, or even

---

14. There is no information in the record about the salary that John Godwin was earning at that time.

15. MECU notes that Ciesla served as the initial branch manager at each of the three new branches and was hired for this purpose. Although this distinguishes Ciesla from the other branch managers, he also was compensated separately for this with an additional bonus of $2,500 in 2000. Ciesla's job as branch manager thus remains substantially similar to Kess and Stafford, and Smith's jobs as branch manager for the purpose of

establishing a prima face claim of discriminatory compensation.

16. The record indicates that Ciesla and Godwin negotiated their starting salaries, while Kess, Stafford, and Vassallo accepted the starting salaries that were offered to them. (Def.'s Mem. at Ex. 1, Wilson Aff., at ¶ 8, 10–12.) Kess testified that Wilson told her that the starting salary offered to her was not negotiable. (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 34–35, 43.)

correct, ultimately, so long as it truly was the reason." *Dugan. v. Albemarle County School Bd.*, 293 F.3d 716, 722 (4th Cir. 2002) (internal quotation omitted). Kess's own opinions about her qualifications and her employer's subjective motivations are not sufficient to establish pretext. *See McCain*, 115 F.Supp.2d at 574, 575–76.

Kess does not dispute other evidence in the record which further supports MECU's explanations. John Vassallo, another white male, was offered and accepted the branch manager position with MECU for a starting salary of $44,000, the same amount offered to Kess and Stafford. Moreover, while Kess and Stafford started with lower salaries than Ciesla, they received comparable annual raises. Ciesla received an annual raise of 3.75 percent in his first year, while Kess received an annual raise of 4.25 percent during her first year. Stafford received two annual raises totaling approximately nine percent during her first two years, while Ciesla's annual raises during this same period totaled approximately ten percent. Finally, Kess and Stafford received annual raises of six percent in 2002, while Ciesla received an annual of raise of five percent that same year.

Kess also has not offered "other forms of circumstantial evidence sufficiently probative" of race or sex discrimination to rebut MECU's explanations. *Mereish*, 359 F.3d at 336. In her deposition, Kess cited other instances in which she alleges that male and/or white employees were treated more favorably than female and/or African–American employees. (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 102–04, 106–09, 116, 118–19, 121–24.) For example, Kess asserts that there are white employees who remain employed at MECU, even though they should have been terminated. These allegations are not contained in Kess's EEOC charge, consist mostly of personal opinion or speculation, and are not supported by any other evidence in the record. This is not sufficient to meet Kess's burden to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## II.

■ Kess alleges that she was discharged in retaliation for raising complaints to MECU management about the salary disparity issue and about Patricia Roberts's use of the term "poor white trash." [17] To establish a prima facie case of retaliation under Title VII, a plaintiff must prove that (1) she engaged in protected activity; (2) an adverse employment action was taken against her; and (3) there was a causal link between the protected activity and the adverse employment action. *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir.2004). Kess has established the first two elements-her complaints to management regarding the salary disparity issue and Patricia Roberts's comments constitute protected activity, and her termination is an adverse employ-

---

17. Kess also points to the incident in July 2002 when she disciplined two employees at the Falstaff branch for using the word "nigger" to refer to each other. Kess testified that she reported this incident to Patricia Roberts and Warren Wilson in the context of determining how to respond to this incident, and that Wilson helped her draft a disciplinary action letter for the two employees. (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 74–77, 91–92.) Kess's participation in a joint decision with management to discipline two subordinate employees does not constitute the kind of opposition to practices made unlawful under Title VII that is protected under 42 U.S.C. § 2000e–3(a). This claim also does not fit with the language in Kess's complaint, which states that she objected to the use of racial terms "by management employees." (Compl. at ¶ 7.)

ment action.[18]

To establish causation, the third element, Kess relies exclusively on temporal proximity. Kess testified that she raised the salary disparity issue with MECU management on several occasions up through August 2002, and she was terminated on August 29, 2002. This is sufficient to establish a prima facie case of retaliation. *See, e.g., Kline v. Certainteed Corp.*, 205 F.Supp.2d 468, 474–75 (D.Md. 2002) (finding that plaintiff had established a prima facie case of retaliation under Title VII where she was terminated within two months of filing EEOC charges). Kess's complaints about Roberts's "poor white trash" remark continued through January 2002, approximately seven months before she was terminated. At best, this provides only weak evidence of causation. *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir.2001) (stating, in an action under the Whistleblower Protection Act, that a six month lag is sufficient to negate any inference of causation); *Byrd v. The Baltimore Sun Co.*, 279 F.Supp.2d 662, 670 (D.Md.2003) (holding that the plaintiff had established a prima facie case of retaliation under Title VII where she was demoted seven months after filing EEOC charges, although noting that the evidence of causation was not strong).

■ In any event, Kess's claim for retaliation fails, because MECU has provided a legitimate, non-discriminatory reason for her termination, and she has failed to establish that this explanation is pretext for retaliation. MECU states that Kess was terminated based on the August 23, 2002 incident at the Falstaff branch and the findings from a subsequent investigation that Kess was mistreating employees at the branch. Kess does not directly dispute the company's version of the events of August 23, which is supported by the record. (Pl.'s Opp. Mem. at Ex. 1c., Rouse Dep., at 36–42; *id.* at Ex. 1d., Hardy Dep., at 32–34, 38–39.) In addition, numerous witnesses testified about ongoing problems at the Falstaff branch during Kess's tenure, and most of the employees attributed these conflicts to Kess. (Def.'s Mem. at Ex. 3, Roberts Aff., at ¶ 3–4, 6–7, 9–10; *id.* at Ex. 4, Pataki Aff., at ¶ 7–8; *id.* at Ex. 5, Smith Aff., at ¶ 5–9; Pl.'s Opp. Mem. at Ex. 1c., Rouse Dep., at 17–18, 21–36; *id.* at Ex. 1d., Hardy Dep., at 5–7, 15–17, 20–25, 41; *id.* at Ex. 1g., Harrison Dep., at 5–11, 23–25; *id.* at Ex. 1h., Tyler Dep., at 5–11, 14–15, 17–18, 21–22.) Members of the management team stated that this information was reported to them, and was the basis for the decision to terminate Kess. (Def.'s Mem. at Ex. 1, Wilson Aff., at ¶ 14–15; *id.* at Ex. 3, Roberts Aff., at ¶ 14; *id.* at Ex. 4, Pataki Aff., at ¶ 11–12.) MECU thus has offered a legitimate, non-discriminatory reason for Kess's termination, which is amply supported by the record. Any inference of retaliation for Kess's complaints about the salary disparity issue is further weakened by the fact that Desiree Stafford, who raised similar complaints during the same time period, was not terminated.

■ Rather than establishing that MECU's explanation is "unworthy of credence" or offering "other forms of circumstantial evidence sufficiently probative" of retaliation, Kess seeks to attack the decision to terminate her on the merits.

---

**18.** Although Patricia Roberts and Warren Wilson stated that Kess never framed the salary disparity issue as one of race or sex discrimination (Def.'s Mem. at Ex. 1, Wilson Aff., at ¶ 19; *id.* at Ex. 3, Roberts Aff., at ¶ 18), this is contrary to testimony by Kess and by Bert Hash (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 78–80; *id.* at Ex. 1i., Hash Dep., at 6–7). Viewing the evidence in the light most favorable to Kess, her complaints constituted opposition to a practice made unlawful under Title VII, and thus were protected activity.

*Mereish,* 359 F.3d at 336. Kess testified that other MECU employees were not disciplined or terminated for their misconduct. (Pl.'s Opp. Mem. at Ex. 1b., Kess Dep., at 107, 110–11, 116, 118, 122–24.) These "unsubstantiated allegations and bald assertions" concerning "the shortcomings of her co-workers" are not sufficient to rebut MECU's articulated non-discriminatory reason for firing her. *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960 (4th Cir.1996). Kess also points to the testimony of two MECU employees praising Kess's performance, criticizing the performance of several of the other branch managers, and stating that Kess should not have been terminated. (Pl.'s Opp. Mem. at Ex. 1a., Speaks Dep., at 12, 14–17; *id.* at Ex. 1e., White Dep., at 9–11, 16–17, 19–25, 27–30.) "It is the perception of the decision maker which is relevant to the question of retaliation, not the opinions of [Kess's] co-workers or other third parties." *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 444 (4th Cir.1998); *see also Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir.2000) (noting that the opinions of co-workers as to a plaintiff's performance are "close to irrelevant" on the issue of pretext).[19] Kess has failed to set forth specific facts from which a reasonable jury could conclude that her termination was motivated by retaliation, rather than the reasons cited by MECU.

### III.

Finally, Kess claims that she was discharged because of her age, in violation of the ADEA. *See* 29 U.S.C. § 623(a)(1). To establish a prima facie case of discriminatory discharge under the ADEA, a plaintiff must prove that (1) she was a member of the protected class, i.e. at least 40 years old; (2) she suffered an adverse employment action; (3) she was at the time meeting the employer's legitimate expectations; and (4) she was replaced by someone who is either outside the protected class or substantially younger than the plaintiff. *Connor v. Giant Food, Inc.,* 187 F.Supp.2d 494, 498–99 (D.Md.2002); *Moore v. Bd. of Educ.,* 63 F.Supp.2d 667, 671 (D.Md.1999); *cf. Hill,* 354 F.3d at 285.[20]

Kess has offered only weak evidence to satisfy the fourth element. Kess was 50 years old when she was terminated by MECU; her replacement, Glenda Smith, was 42 years old. Kess thus was replaced by an employee within the protected class under the ADEA. *See* 29 U.S.C. § 631(a). It is not clear whether the age gap of eight years between the two employees is sufficient, in itself, to meet the "substantially younger" standard. *See Grosjean v. First Energy Corp.,* 349 F.3d 332, 336–40 (6th Cir.2003) (noting that most decisions have

---

**19.** Neither Sharon Speaks nor Delores White has any personal knowledge of the events of August 23, 2002 at the Falstaff branch or of the past conflicts between Kess and her staff. (Pl.'s Opp. Mem. at Ex. 1a., Speaks Dep., at 9, 23–24; *id.* at Ex. 1e., White Dep., at 36–41.) Moreover, at the time of her deposition White was on medical leave from MECU for anxiety attacks stemming from what she describes as a "hostile, threatening environment" at work. (*Id.* at Ex. 1e., White Dep., at 32–35.)

**20.** In *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) the Supreme Court clarified that a plaintiff can make out a prima facie claim for discriminatory discharge under the ADEA even if the replacement employee also falls within the ADEA's protective scope. The Court suggested that replacement by a "substantially younger" individual is a better indicator of age discrimination. *See id.* at 313, 116 S.Ct. 1307. The Fourth Circuit since has suggested that the fourth element of a prima facie claim for discriminatory discharge under the ADEA could be modified to include replacement by a substantially younger individual. *See Causey v. Balog,* 162 F.3d 795, 802 & n. 3 (4th Cir.1998).

 

required a gap of at least ten years, but declining to disagree with decisions holding that an eight or nine year gap can be sufficient); *Jeffers v. Thompson*, 264 F.Supp.2d 314, 328 (D.Md.2003) (noting that an 11 year gap is sufficient, but a five year gap probably is not). Kess also has failed to establish the second element-that she was at the time meeting her employer's legitimate expectations-based on the evidence cited above regarding the August 23, 2002 incident and ongoing problems at the Falstaff branch under Kess.

In any event, Kess has failed to carry her ultimate burden of establishing a reasonable inference of impermissible age discrimination. Putting aside the age gap between Kess and Smith, the remaining evidence contradicts Kess's claim of age discrimination. Kess was fired by the same four members of the MECU management team that had hired her "a relatively short time" after her hiring, which creates "a strong inference" against a finding of discrimination. *Proud v. Stone*, 945 F.2d 796, 797–98 (4th Cir.1991) (applying to six-month time span); *see also Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000) (applying to three-year time span); *Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir.1999) (applying to one-year time span). This inference against discrimination is even stronger when the plaintiff already was within the scope of the ADEA when she was hired, and was replaced by another ADEA-protected individual. "[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 513 (4th Cir.1994) (quoting *Proud*, 945 F.2d at 798).[21] Kess has failed to set forth specific

facts sufficient for a reasonable jury to find that she was discharged because of her age.

A separate order follows.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the defendant's motion for summary judgment (docket no. 12) is **GRANTED;**

2. copies of this Order and the accompanying Memorandum shall be sent to counsel of record; and

3. the clerk of the court shall **CLOSE** this case.

---

21. Also relevant on this point is that MECU hired at least one other branch manager, Frank Ciesla, who fell within the scope of the ADEA. Ciesla was born on January 21, 1950, and thus was 49 at the time of his hire.