Zhenlu ZHANG

v.

**SCIENCE & TECHNOLOGY
CORP., et al.**

No. CIV.A.DKC 2004–0434.

United States District Court,
D. Maryland.

Aug. 10, 2005.

Steven W. Ray, Esq., Edward Lee Isler, Esq. of Ray & Isler, P.C., and JC Miller, Esq. of Schmeltzer, Aptaker & Shepard, P.C., Vienna, VA, for Defendants.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this employment discrimination action are (1) a motion by Defendant Science and Technology Corporation ("STC") for summary judgment (Paper 65); (2) a motion by Defendant Computer Sciences Corporation ("CSC") for summary judgment (Paper 66); (3) a motion for leave to file a surreply by Plaintiff Zhenlu Zhang (Paper 93); and (4) Plaintiff's urgent motion re-

questing the court to take legal action (Paper 96). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for leave to file a surreply and the motions for summary judgment will be granted. To the extent Plaintiff's last motion (Paper 96) is capable of being granted or denied, as opposed to merely being a second surreply, that motion will be denied.

## I. Background

### A. Factual Background

The following facts are either uncontroverted or viewed in the light most favorable to Plaintiff Zhenlu Zhang. Defendant CSC is the prime contractor with the National Oceanographic and Atmospheric Administration ("NOAA") on a project referred herein as the Central Satellite Data Processing Center Project ("CSDPC Project" or "the Project"). The main base for all work on the Project is the federal NOAA facility in Suitland, Maryland. CSC subcontracts with several companies to perform various tasks related to the CSDPC Project. Two such companies are Westover Consultants, Inc. ("Westover") and Defendant STC. Under their separate and respective subcontracts with CSC, Westover and STC agree to staff a certain number of positions on the CSDPC Project

with their own employees.[1] CSC's project manager for NOAA programs was James Boney. Paper 66, Ex. 2 ("Boney Decl. I"), ¶ 3. STC's project manager was David Donahue. Paper 65, Ex. 2 ("Donahue Aff."), ¶ 2.

In late September 2001, after being interviewed and recommended by Donahue, Plaintiff Zhenlu Zhang was hired at age 57 by STC as a Programmer/Analyst on the CSDPC Project. In his formal offer letter, dated September 20, 2001, STC advised Plaintiff that because his position supported a government contract, it was "contingent upon continuing appropriate contracts." Paper 65, Ex. 4 (STC Offer Letter).[2] Plaintiff began work on September 24, 2001, whereupon he was assigned to the "porting project." Donahue Aff., ¶ 6; Paper 66, Ex. 4 ("Plaintiff's CSC Dep.") at 42–43. Although Plaintiff often worked on tasks and teams with employees from CSC, NOAA, and other subcontractors, he was at all times an STC employee and reported primarily to Donahue, STC's project manager. Paper 65, Ex. 5 at 21. In addition, upon his first day, Plaintiff was issued several documents containing STC policies related to discrimination and harassment and STC's Rules of Proper Business Conduct. Although Plaintiff testified that he did not read the policies and did not think they applied to him, it is undisputed that he signed the

---

1. Although CSC contracted with both STC and Westover, CSC does not have the power to hire and/or terminate employees of Westover or STC or control the employment terms of their respective employees. *See* Paper 90, Ex. 3 ("Boney Decl. II"), ¶ 5. Moreover, STC and Westover are entirely separate and distinct entities, are not affiliated in any capacity, and do not have any contractual relationship. *See* Paper 89, Ex. A ("Deepak Aff."). Finally, STC does not direct, manage, oversee, or control the hiring and firing of any employee of Westover, nor vice-versa, and neither can control the employment terms or

relationship with the others respective employees. *Id.*

2. At all relevant times, the NOAA official with primary oversight on the CSDPC Project was Barbara Banks, the Chief of the Information Processing Division. *See* Paper 65, Ex. 1 ("Banks Dep.") at 8. Ms. Banks testified that because the NOAA depends on appropriated funding from Congress, on several occasions during her tenure as Chief, the NOAA had experienced budget shortfalls that required CSC and its subcontractors to prioritize certain tasks and realign staff, which included layoffs. *Id.* at 12–13.

documents, certifying that he had "received, read, and understood" both STC's Harassment Policy and its Rules of Proper Business Conduct Policy, and that he "agree[d] to abide by [their] requirements." Paper 65, Exs. 8, 9.

Shortly after his hire, problems began to develop in the working relationship between Plaintiff and another STC employee on the porting project team, Alex Pozniak. Pozniak had been working on the CSDPC Project since February 1997, and had already been working on the porting project team well before Plaintiff was hired. *See* Boney Decl., ¶ 8. By Plaintiff's own admission, he and Pozniak often had "disagreements" and "misunderstandings" related to the work. *See* Plaintiff's CSC Dep. at 46–47. According to Donahue, even after he spoke with Plaintiff, the working relationship between Plaintiff and Pozniak continued to deteriorate. *See* Donahue Aff., ¶ 6. Eventually, in December 2001, Donahue and Boney decided that Plaintiff and Pozniak could no longer work on the same team and needed to be separated. *Id.* Because Pozniak had much more experience on the porting project than Plaintiff, and because the team leader, Rich Kelley, felt Pozniak's transfer would disrupt operations, Donahue decided to transfer Plaintiff from the porting project team to the product systems development (PSD) team. *Id.*

Shortly thereafter, in January 2002, NOAA faced a budget shortfall, restricting the funding for the PSD team. Banks Dep. at 15, 17–18. Specifically, the number of funded positions on the PSD team was cut from seven to three, and Donahue was advised that there would not be enough funding to support all the STC staff on the team. Boney Decl. I, ¶ 10. Accordingly, in late January 2002, Donahue met with Plaintiff and informed him that because he was the last STC employee hired, he was the first employee select-

ed for the pending layoff, effective at the end of February 2002. Donahue Aff., ¶ 7. However, Donahue advised Plaintiff that he and STC would assist Plaintiff in trying to locate another position on a portion of the CSDPC Project that was still receiving funding. *Id.*

In February 2002, Donahue was successful in arranging an interview for Plaintiff. *Id.; see also* Paper 65, Ex. 3 ("Plaintiff's STC Dep.") at 62–63. In late February, Plaintiff interviewed with Dr. Francis Schiffer, a long-time CSC employee, for a position on the Shared Processing Program (SPP) project. *See* Paper 66, Ex. 10 ("Schiffer Decl."), ¶ 5; Plaintiff's STC Dep. at 62–63. The SPP project is one of the task groups within the CSDPC Project. At that time, Dr. Schiffer anticipated needing someone to take over some of his responsibilities so that he could devote his attention to a new project that he believed was forthcoming. Schiffer Decl., ¶ 5. Dr. Schiffer had been working alone on the SPP project, and if the new project materialized, contingent upon government approval and funding, Dr. Schiffer would need to devote a significant part of his time to the new project and would be unable to continue his duties on the SPP. *Id.; see also* Paper 65, Ex. 12 ("Schiffer Dep.") at 29–32. Accordingly, in anticipation of the additional work, Dr. Schiffer interviewed and agreed to accept Plaintiff on a trial basis, effective March 1. Schiffer Aff., ¶¶ 6–7. Plaintiff was informed in a second offer letter that the transfer to Dr. Schiffer's team would have no effect on his salary and benefits, that it was offered on a "probationary basis," and that it was "contingent upon continuing appropriate contracts." Paper 65, Ex. 11.

In March 2002, Plaintiff began working with Dr. Schiffer on the SPP project. At this time, Plaintiff was the only person on Dr. Schiffer's team. In early summer of

2002, however, the NOAA decided to use an outside vendor, rather than CSC, to perform the work that Dr. Schiffer had anticipated he would perform. Schiffer Aff., ¶ 8; Schiffer Dep. at 30–33. Accordingly, because the extra work he anticipated never materialized, he could continue devoting his time to the SPP project, and thus, no longer required Plaintiff's assistance. Schiffer Aff., ¶ 9. Simply put, "it had become clear ... that the work that [he] wanted [Plaintiff] to perform was no longer necessary, and as such, his position needed to be eliminated." *Id.*[3]

On August 15, 2002, CSC's Project Manager Boney advised Donahue that the anticipated work was not going to materialize and that Plaintiff's services with Dr. Schiffer were no longer required after September 30, 2002. Donahue Aff., ¶ 8. Donahue consulted with STC's Human Resources department in an attempt to find another open position for Plaintiff. *Id.* At that time, STC had no open positions for which Plaintiff was qualified and it determined that he would need to be laid off at the end of September. *Id.* On Monday, August 19, 2002, Donahue advised Plaintiff of the impending layoff, but once again, informed him that he would help him find another position that matched his skills. *Id.*, ¶ 9; *see also* Plaintiff's STC Dep. at 78. Shortly thereafter, in a letter dated August 20, 2002, STC reiterated that there was no more work on the CSDPC Project that matched Plaintiff's skills, and that his employment with STC would not be continued after September 30, 2002. Paper 65, Ex. 13. Plaintiff testified in his deposition that he believed the reason stated in the letter for his layoff, i.e., that there was no more work on the CSDPC Project that matched his skills, was, in fact, the truth. *See* Plaintiff's CSC Dep. at 111–12. The letter

also provided, as promised by Donahue, that STC would continue its "efforts to find appropriate work requiring [his] skills." *Id.* In fact, as promised, Donahue asked John Sapper, an NOAA manager if he would consider creating a position on his team for Plaintiff. Donahue Aff., ¶ 9; Plaintiff's STC Dep. at 77–78. Although Mr. Sapper was reluctant, he told Donahue that he would consider it. Donahue Aff., ¶ 9.

The Sunday after Plaintiff had been informed of his impending layoff, August 25, 2002, Plaintiff went to the home of Ms. Barbara Banks, Chief of the Information Processing Division of the NOAA's National Environmental Satellite, Data and Information Services. Banks Dep. at 31–32. Other than one interaction in her office in February, and a few sporadic meetings in an elevator, Plaintiff had little contact with Ms. Banks. *See* Banks Dep. at 18; Plaintiff's CSC Dep. at 120. Plaintiff testified that he found her address by going to a library in Virginia a day or two before he went to her house and accessing the internet through one of the library computers. Plaintiff's CSC Dep. at 119–20. On Sunday, August 25, Plaintiff drove over to Ms. Banks' house, parked on the street where his car could not be seen from the house, and walked up to her front door. *Id.* at 130–33. At that point, her husband came around from the back of the house and Plaintiff presented to him a bag that contained a letter for Ms. Banks, together with a boxed "Chinese cake." *Id.* As Plaintiff was leaving, Ms. Banks observed him from inside her house. Banks Dep. at 35. Although Ms. Banks was home, she did not speak to Plaintiff. Ms. Banks testified that, when her husband returned inside and told her what transpired, she felt "scared," "shocked," and deeply dis-

---

**3.** It is undisputed that no person replaced Plaintiff in his position assisting Dr. Schiffer with the SPP project, and that he continues to maintain that system himself. Schiffer Decl., ¶ 11; Schiffer Dep. at 56.

turbed. *Id.* at 34. In her 26 years with the NOAA, no employee of either the government or a contractor had ever shown up unannounced and uninvited at her home. *Id.* at 36.

The following morning, Monday, August 26, 2002, Ms. Banks returned to her office at the Suitland facility with Plaintiff's unopened bag. When she accessed her computer, she discovered an e-mail letter that Plaintiff had sent to her on the previous Friday. *Id.* at 35. Apparently, this letter was identical to the one Plaintiff had placed in the gift bag with the cake. Because Ms. Banks did not open the bag on Sunday, she had not seen the letter prior to that Monday. In paragraph 4, Plaintiff stated:

> I know you are very busy but if I lose job, I will lose confidence to live thinking that I did my very best and could not keep job.

Paper 65, Ex. 15. Ms. Banks testified that upon reading the letter she formed the impression that Plaintiff was "unstable," and that he "didn't have the will to live." Banks Dep. at 37. She further believed it was possible that Plaintiff posed a risk to himself and others working at the Suitland facility. *Id.* at 37–38. She immediately contacted Mr. Boney, CSC's Project Manager, and advised him of the events of the previous day and the e-mail letter. *Id.* at 30–31, 37–40. At that point, Boney met with Donahue to inform him of the matter. Donahue Aff., ¶ 10; Boney Aff. I, ¶ 20. Donahue immediately sought out Plaintiff and, with Boney present, asked him about the events of the previous day. Donahue Aff., ¶ 10; Plaintiff's STC Dep. at 106–07. Although Plaintiff testified that "there wasn't any criticism" offered by Donahue or Boney, they did tell him "not to do this." *Id.* at 106–07.[4]

Following his meeting with Donahue and Boney, Plaintiff approached Ms. Banks in the hallway just outside of her office. Plaintiff's STC Dep. at 111–15; Plaintiff's CSC Dep. at 151. Although Ms. Banks did not ask to see Plaintiff, he testified that Donahue gave him permission. Plaintiff's STC Dep. at 111–15. At this point, Plaintiff claims that he stated to Ms. Banks that "the young, new Chinese do not know the basic skill, the technique." *Id.* at 111. He also asserts that he told her "they do not have any reason to lay me off; but if they insist—still insist they lay me off, I feel some discrimination." *Id.* at 112. Plaintiff admits that this was the extent of his complaint that day, and that prior to August 26, 2002, he had not mentioned to anyone that he felt he was being discriminated against. *Id.* After speaking to Ms. Banks, Plaintiff continued to send her e-mails seeking her intervention on his impending layoff. Plaintiff's CSC Dep. at 162–63; Banks Dep. at 68. Ms. Banks continued to view such contact as threatening and harassing and informed Boney and Donahue that she wanted it to cease. Banks Dep. at 68. Based on what Ms. Banks perceived to be unstable conduct, she spoke with Donahue about accelerating Plaintiff's termination date. She testified:

> I indicated to Mr. Donahue we needed to accelerate the layoff based on the fact that I felt that we were in an unsafe environment if Mr. Zhenlu [sic] stayed. And I asked him what date had they planned [on] laying Mr. Zhang off, and he said September. And I requested that perhaps we need to accelerate that because I thought we were in an unstable and unsafe environment.

Banks Dep. at 51–53. At that point, Donahue assured Ms. Banks that STC would

---

4. Donahue claims that he also informed Plaintiff that there might be additional repercussions because of his actions, but Plaintiff does not mention this comment in his deposition. *See* Donahue Dep., ¶ 10.

accelerate Plaintiff's layoff. *Id.* After consulting with his superiors and STC's Human Resources Department, it was agreed upon that STC would accelerate Plaintiff's layoff. On the morning of August 29, 2002, Donahue, together with his assistant, met with Plaintiff to inform him that his services were no longer needed and that his layoff was effective immediately. Donahue Aff., ¶¶ 13–14. At that point, Donahue, who had interviewed and recommended Plaintiff for hire less than a year before, gave Plaintiff a formal separation letter that stated, "Due to recent circumstances, STC's client feels that your continued employment on the CSDPC contract is no longer required," and that his "last day of work at Suitland and with STC will be August 29, 2002," that very day. Paper 65, Ex. 18. The letter further stated that it superceded the previous STC letter indicating his services would be terminated at the end of September, and that "[d]ue to new circumstances, the first letter ha[d] been rescinded." *Id.* Donahue testified that he told Plaintiff that because of his recent conduct, and the concern surrounding it, STC had to accelerate his layoff. Paper 66, Ex. 18 ("Donahue Dep.") at 75. Plaintiff, however, testified that Donahue told him he was being laid off because "We do not want you to sit down and write e-mail to the government to make a complaint." Plaintiff's CSC Dep. at 167. At that point, a federal security officer escorted Plaintiff out of the building. *Id.*

### B. Procedural Background

On April 29, 2003, Plaintiff filed a charge with the EEOC alleging age and race discrimination, as well as retaliation, against STC and CSC. The EEOC issued a right to sue letter on November 25, 2003. On February 19, 2004, Plaintiff filed suit in this court, alleging age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 601 *et seq.*, and retaliation.[5] After discovery, the court granted a motion by Plaintiff's counsel to withdraw, and Plaintiff continued pro se. *See* Paper 60. Shortly thereafter, Defendants STC and CSC filed respective motions for summary judgment. *See* Papers 65, 66. After those motions were fully briefed, Plaintiff filed a motion for leave to file a surreply, together with an attached surreply. That same day, he also filed a motion entitled "Plaintiff's Urgent Motion Requesting the Court for help to take any legal activities immediately to control the attempted crime and protect Society Security and Plaintiff's life." Paper 96.

The court has read and considered all the memoranda and supporting documents filed in this case. Because Plaintiff is proceeding pro se and neither Defendant objected to the filing of his surreply, Plaintiff's motion for leave to file a surreply (Paper 93) will be granted. However, precisely what Plaintiff seeks in his last motion is unclear. It appears that Paper 96 merely contains additional arguments in opposition to Defendants' motions for summary judgment. To the extent Paper 96 seeks anything, that motion will be denied. The court will now turn to STC's and CSC's motions for summary judgment. For the following reasons, the motions will be granted.

---

**5.** Although Plaintiff originally checked "Race" on his EEOC charge of discrimination, he makes no mention of race discrimination in his complaint, has not alleged any facts that would support a claim for race discrimination, and makes no argument nor provides any evidence in his opposition papers that suggests he is advancing such a claim. Accordingly, the court concludes Plaintiff's complaint is one for age discrimination and retaliation in violation of the ADEA only.

## II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of South Carolina v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Services Co.*, 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. Analysis

### A. Age Discrimination

■ Section 4(a) (1) of the ADEA, 29 U.S.C. § 623(a)(1), provides, in pertinent part: "It shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." In order to establish a cause of action under the ADEA, "a plaintiff must demonstrate that but for the employer's motive to discriminate against the plaintiff on the basis of age, the plaintiff would not have been discharged." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir.1992). "The Fourth Circuit recognizes two avenues of proof by which an employee can prove an ADEA violation: '(1) under ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue, or (2) under a judicially created proof scheme originally used in the Title VII context in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] and subsequently adapted for use in ADEA

cases.' " *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir.1996) (quoting *Tuck v. Henkel Corp.*, 973 F.2d 371, 374–75 (4th Cir.1992)); *Clay Printing*, 955 F.2d at 940. Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir.2002). If a plaintiff establishes a *prima facie* case of discrimination through circumstantial evidence, the burden of production then shifts to the defendant to provide a legitimate, non-discriminatory reason for the differential treatment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The plaintiff must then " 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Tech. Applications & Service Co.*, 80 F.3d 954, 959 (4th Cir.1996) (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). Here, Plaintiff has put forth no direct or indirect evidence of intentional discrimination surrounding his employment at STC, and thus, he must proceed under the *McDonnell Douglas* burden-shifting framework.[6]

Defendants STC and CSC argue in their respective briefs that they are entitled to summary judgment on Plaintiff's age discrimination claim because Plaintiff has failed to establish a *prima facie* case of

discrimination. They also assert that even if Plaintiff could establish a *prima facie* case, they have asserted several legitimate, non-discriminatory reasons for any adverse employment action taken against Plaintiff, which Plaintiff has not established were a pretext for discrimination. Defendant CSC also argues that STC, and not CSC, was at all times Plaintiff's employer and, thus, CSC cannot be held liable under the ADEA, although Plaintiff vigorously disputes this in his opposition brief. *See* Paper 82. The court need not address most of these arguments, however, because Plaintiff has failed to establish even the slightest inference that any employment action, whether by STC or CSC, was taken on account of his age. That is, even assuming Plaintiff could establish a *prima facie* case of discrimination, Plaintiff has failed to put forth any evidence " 'that the legitimate reasons offered by [Defendants] were not [the] true reasons, but were a pretext for discrimination.' " *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

Although STC and CSC frame the *prima facie* case Plaintiff must first establish in slightly different contexts, *compare* Paper 65 at 18 (*prima facie* case of discriminatory reduction in force), *with* Paper 66 at 19 (*prima facie* case of discriminatory discharge), the burden shifting framework and analysis remains the same. As the Fourth Circuit recognized after *Reeves*, "[w]hile the elements of a prima facie case differ depending on the statute and the nature of the claim, proving a discrimination claim under any of these federal statutes requires a showing that an employer's asserted non-discriminatory reason for the challenged employment action is actually a pretext." *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir.2000)

6. Indeed, Plaintiff seemingly concedes this point with his continual references in his opposition briefs to the Supreme Court's opinion in *Reeves*. *See* Papers 81, 82.

770

(citing *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). Like the plaintiff in *Rowe*, Mr. Zhang relies heavily on *Reeves* in arguing that Defendants' asserted reasons for laying him off are pretextual.

In *Reeves*, the Court granted certiorari to resolve the conflict among the circuits "as to whether a plaintiff's prima facie case of discrimination, ... combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." *Reeves*, 530 U.S. at 140, 120 S.Ct. 2097. As the Fourth Circuit explained:

> The *Reeves* Court recognized that its decision in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), taught that "the fact-finder's rejection of the employer's legitimate, nondiscriminatory reason for its action *does not compel* judgment for the plaintiff." *Reeves*, 120 S.Ct. at 2108 (emphasis added). The Court clarified, however, that it is "permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* Thus, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 2109. In so holding, the Supreme Court invalidated the requirement that "a plaintiff must always introduce additional, independent evidence of discrimination" to survive summary judgment. *Id.*

Put another way, in *Reeves* the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employ-

er's explanation is pretextual, this does not automatically create a jury question, but it *may* do so. Even when a plaintiff demonstrates a prima facie case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if "no rational factfinder could conclude that the action was discriminatory." *Id.* But, absent such evidence, courts may not require a plaintiff who proves both a prima facie case and pretext to produce additional proof of discrimination in order to survive a defendant's motion for summary judgment. This is so because "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 2108. *Rowe*, 233 F.3d at 830. With these principles in mind, it is clear that Plaintiff "has not forecast any evidence that casts doubt on the veracity of [Defendants'] proffered explanation" for any employment action taken against Plaintiff. *Id.* at 831.

■ Although Plaintiff's ultimate layoff on August 29, 2002 was an adverse employment action, Plaintiff may be attempting to allege that other actions taken by Defendants were adverse employment decisions motivated by his age. His complaint and opposition briefs, none of which are models of clarity, seem to take issue with several actions taken by Defendants: (1) the decision to transfer him in December 2001 off the porting project team to the PSD team; (2) the first layoff decision in late January 2002, which ultimately did not occur because of the opportunity that developed with Dr. Schiffer; (3) the second layoff decision in late August 2002, to be effective September 30; and (4) the decision to accelerate his layoff from September 30, 2002 to August 29, 2002.[7]

---

7. Plaintiff also suggests in his opposition briefs that Defendants discriminated against him in his salary, as well as "deprived his

right to support the fight against terrorism and love the County." *See* Paper 81 at 19 and

First, Plaintiff takes issue with his transfer off the porting project team, where he was originally assigned, to the PSD team. He contends that this decision was made because of his age, arguing that he was doing good work and noting the fact that his "replacement" on the porting project team was a younger Chinese employee. *See* Paper 81 at 12. First, the question of whether Plaintiff was performing well on the porting project team is simply not relevant here. Defendants have not asserted that their decision to transfer Plaintiff off the porting project team was due to his inability to do the work well. Rather, they argue, and the evidence unequivocally demonstrates, that the decision was related to inter-personnel conflicts between Plaintiff and a fellow co-worker. As discussed above, *see supra* I.A., Plaintiff admits that he and Pozniak often had "disagreements" and "misunderstandings" related to the work. *See* Plaintiff's CSC Dep. at 46–48. Plaintiff's own submissions in support of his opposition demonstrate work related problems between Plaintiff and Pozniak. *See* Paper 81, Ex. 9 (12/14/2001 e-mail). According to Donahue, even after he spoke with Plaintiff, the working relationship between Plaintiff and Pozniak continued to deteriorate. *See* Donahue Aff., ¶ 6. Eventually, Donahue, in consultation with Boney and Rich Kelley, the porting project team leader, decided to transfer Plaintiff from the porting project team to the product systems development (PSD) team. *Id.; see also* Paper 66, Ex. 8 ("Boney Dep.") at 42–44 (discussing the need for programmers "to be able to work with one another"). Transferring Pozniak, rather than Plaintiff, was not an option because of Pozniak's undisputed greater experience, and his history of establishing a good working relationship with the other employees on the team. *See* Donahue Aff., ¶ 6; Boney Decl. I, ¶ 9. Although it is true that Plaintiff, in essence, switched positions with a younger Chinese employee, Yan, who had been working on the PSD project, there simply is no evidence, direct or circumstantial, that that switch was precipitated by any reason other than what Defendants assert, i.e., an inter-personnel conflict between Plaintiff and Pozniak.[8] "The decision to [switch Plaintiff and Yan] is the kind of business decision that [courts] are reluctant to second guess." *Rowe*, 233 F.3d at 831 (citing *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA.")). Simply put, Plaintiff has failed to establish the slightest inference that Defendants' "'proffered explanation [for transferring

Paper 82 at 16. However, these claims were not included in either Plaintiff's EEOC charge or the complaint filed in this court. The court may hear only those claims raised in the EEOC complaint or those "reasonably related" *to that complaint* and which "can be expected to follow from a reasonable administrative investigation." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir.2000) (emphasis added) (citing *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir.1981)); *see Evans*, 80 F.3d at 963 ("Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit."). Not only are these assertions not reasonably related to the allegations contained in his EEOC charge, they were not even included in his complaint. Even if there was evidence in the record to support these claims, which there is not, the court would not entertain them based on the principles cited above.

8. Apparently, JinJin Yan was an employee of Westover, the other subcontractor on the CSDPC Project. Paper 90, Ex. 3 ("Boney Decl. II"), ¶ 7.

Plaintiff off the porting project team] is unworthy of credence.'" *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089).

■ Moreover, the fact that Donahue, the same person who interviewed and recommended Plaintiff for hire with full knowledge of his age, was the person who decided a transfer was necessary creates a strong inference that age discrimination was not the basis for the action. *Cf. Proud v. Stone*, 945 F.2d 796, 797–98 (4th Cir.1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."). Further, "[t]his inference against discrimination is even stronger when the plaintiff already was within the scope of the ADEA when she was hired." *Kess v. Municipal Employees Credit Union of Baltimore, Inc.*, 319 F.Supp.2d 637, 649 (D.Md.2004); *cf. Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 513 (4th Cir. 1994) ("[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing."). In light of the powerful inference against discrimination and the overwhelming and undisputed evidence of work-related conflicts between Plaintiff and Pozniak, "[Plaintiff] has failed to set forth specific facts sufficient for a reasonable jury to find that [he] was [transferred] because of [his] age." *Kess*, 319 F.Supp.2d at 649.[9]

■ Plaintiff's arguments as to his remaining assertions of age discrimination are even more tenuous. First, to the extent he claims that the decision in January 2002 to lay him off at the end of February was motivated by age, Plaintiff has utterly failed to put forth any evidence that casts doubt on Defendants' proffered explanation. As testified to by Ms. Banks, in January 2002, NOAA faced a budget shortfall, restricting the funding for the PSD team. Banks Dep. at 15, 17–18. She testified that although budget cuts may not happen frequently, it is a fact that occurs from time to time, including in January 2002. Accordingly, in late January 2002, Donahue met with Plaintiff and informed him that because he was the last STC employee hired, he was the first employee selected for the pending layoff at the end of February 2002. Donahue Aff., ¶ 7. Plaintiff has put forth no evidence to suggest that funding to the Program was not cut, nor that he was not, at that time, the last STC employee hired. Moreover, the undisputed fact that Donahue advised Plaintiff that he and STC would assist Plaintiff in trying to locate another posi-

9. Perhaps most fatal to Plaintiff's transfer claim is his inability to demonstrate that his transfer off the porting project team to the PSD team was an adverse employment action. "While an adverse employment action need not be an 'ultimate employment decision' such as termination, the action taken must adversely affect 'the terms, conditions, or benefits of employment.'" *Hoffman v. Baltimore Police Dept.*, 379 F.Supp.2d 778, ——, 2005 WL 1811818, at *12 (D.Md.2005) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir.2001)). There simply is no evidence that his transfer to the PSD team, or his subsequent transfer to Dr. Schiffer's team, adversely affected the terms, conditions, or benefits of his employment. In fact, the formal letter offering him a position with Dr. Schiffer explicitly stated that it would have "no effect on [his] salary or benefits." Paper 66, Ex. 11. Although this fact has more to do with whether a *prima facie* case for employment discrimination has been established, it also strongly counsels against a finding of discriminatory animus on the part of Defendants. Moreover, although it is true funding for the PSD was cut shortly after Plaintiff's transfer, there is no evidence that Defendants knew this prior to making their decision.

tion, and that they were in fact successful in that endeavor, also raises a strong inference against discrimination. Additionally, as mentioned above, the transfer to Dr. Schiffer's team, which extended his duration of employment, had no effect on his salary and benefits. *See* Paper 66, Ex. 11. Here too, Plaintiff has failed to demonstrate that Defendants' proffered reason for his February layoff (which was averted because of Defendants' efforts) is unworthy of credence.

■ Likewise, Plaintiff has produced no evidence to suggest that Defendants' second layoff decision, which ultimately ended his employment with STC, was motivated by anything other than the reasons asserted. As discussed above, Plaintiff's transfer to the SPP team to assist Dr. Schiffer was motivated by the anticipated extra work expected to take up a considerable amount of Dr. Schiffer's time. As a result, he agreed to take on Plaintiff, freeing himself up to spend more time on the anticipated increased workload. When that did not materialize because the NOAA decided to use an outside vendor, rather than CSC and Dr. Schiffer, he could continue devoting his time to the SPP project, and thus, no longer required Plaintiff's assistance. Schiffer Aff., ¶¶ 8, 9; Schiffer Dep. at 30–33. Simply put, when it became evident in the summer of 2002 that the anticipated work increase would not materialize, "it had become clear ... that the work that [he] wanted [Plaintiff] to perform was no longer necessary, and as such, his position needed to be eliminated." *Id.* Accordingly, on August 19, 2002, five days after Donahue discovered that Dr. Schiffer would not be getting the extra work anticipated, he informed Plaintiff that STC had decided to lay him off. *See* Donahue Aff., ¶¶ 8–9. It is undisputed that no person replaced Plaintiff in his position assisting Dr. Schiffer with the SPP project, and that he continues to maintain that system himself. Schiffer Decl., ¶ 11; Schiffer Dep. at 56.[10] Thus, Plaintiff has not "forecast any evidence that casts doubts on the veracity of [Defendants'] proffered explanation for his [layoff.]" *See Rowe*, 233 F.3d at 831. As Plaintiff has failed to "provide sufficient evidence from which a reasonable trier of fact could find falsity" as to any of Defen-

---

**10.** Plaintiff attempts to create some doubt as to the legitimacy of Defendants' decision to lay him off after the work did not materialize by identifying two younger Asian males who worked at the Suitland facility. This effort is simply unavailing. First, he identifies a Mr. Xiao, whom he argues was younger than him and hired around the time he was laid off. However, Plaintiff testified that he did not know what company hired him, to what team he was assigned, nor the nature of his duties. Plaintiff's CSC Dep. at 188. However, the documents Plaintiff submitted in support of his opposition indicate that Mr. Xiao was not hired by either CSC or STC, but rather employed by Westover, the other subcontractor on the Project. *See* Paper 81, Ex. 11 (Westover Documents). Moreover, these documents indicate that Mr. Xiao was hired as a Software Engineer, not a Programmer/Analyst like Plaintiff. *Id.* The other employee Plaintiff identifies, Mr. Yu, was hired in the summer of 2002 by STC as a physical scientist in the Soundings group, a position that required meteorological experience. *See* Paper 89, Ex. E ("Donahue Dep. II") at 34–35. Although Plaintiff admits in his opposition brief that he "does not have meteorological experience," he nevertheless asserts he was better qualified for that position. *See* Paper 81 at 18. Plaintiff provides no evidence to support this self-serving, conclusory allegation. *See Obi v. Anne Arundel County* 142 F.Supp.2d 655, 664–65 (D.Md.2001) ("Without some evidence that [the adverse employment action] was motivated by discrimination, a claim cannot proceed merely with the allegation of superior qualifications."). Notwithstanding the fact that Mr. Xiao and Mr. Yu were hired around the time Plaintiff was laid off, Plaintiff has presented no evidence to discredit Defendants' proffered non-discriminatory reason for Plaintiff's layoff. "[I]t is [Plaintiff's] failure to demonstrate pretext on [Defendants'] part that dooms his federal claims." *Rowe*, 233 F.3d at 831.

dants' explanations, Defendants are entitled to summary judgment on Plaintiff's claims of discrimination under the ADEA. *See Price v. Thompson,* 380 F.3d 209, 217 (4th Cir.2004).

### B. Retaliation

Plaintiff also alleges Defendants retaliated against him in violation of the ADEA. In order to survive summary judgment, a plaintiff must establish a *prima facie* case of retaliation by offering evidence from which a reasonable jury could find that (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) a causal connection existed between the protected activity and the adverse action. *See Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 754 (4th Cir.), *cert. denied,* 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996). Like cases asserting discrimination, once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to offer evidence of a legitimate, nonretaliatory reason for the adverse employment action, *see Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989), after which the burden shifts back to the plaintiff to produce evidence that the defendant's proffered reason was a pretext for retaliation. *Anderson v. G.D.C., Inc.,* 281 F.3d 452, 458 (4th Cir.2002).

■ Again, it is not entirely clear what actions taken by Defendants that Plaintiff believes were retaliatory. To the extent he claims his layoff was retaliatory, Plaintiff's own words contradict that assertion. First, Plaintiff testified in his deposition that he believed the reason stated for his layoff in the August 20, 2002 letter, i.e., there being no more work on the CSDPC Project that matched his skills, was, in fact, the truth. *See* Plaintiff's CSC Dep. at 111–12. Moreover, in his opposition, he states "[n]ot only one but many protected activities were taken *after Zhang was noti-*

*fied"* that he was to be laid off. *See* Paper 81 at 23 (emphasis added). Further, it is undisputed that STC notified Plaintiff of its decision to lay him off on August 19, 2002, that he received a formal letter of that decision on August 20, and that, by his own admission, he did not make any complaints to any person regarding discrimination until August 26. *See* Donahue Aff., ¶ 9; Paper 65, Ex. 13 (Layoff letter); Plaintiff's STC Dep. at 76–77, 112–13, 139. Every "protected activity" that Plaintiff identifies in his opposition papers occurred after STC had notified him of his imminent layoff. *See* Paper 81 at 23–24. Thus, there is no causal connection between his making a complaint of discrimination and his layoff. *See, e.g., Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 651 (4th Cir.2002) ("Thompson failed to satisfy the causation element of his prima facie case by showing that the adverse employment action took place *after the filing of the discrimination claim."*) (emphasis added); *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir.1998) ("To satisfy the third element, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity.") (emphasis in original); *Gaskins v. Witt,* 2001 WL 30528, at *6 (D.Md.) (D.Md.2001) (Chasanow, J.). Accordingly, the uncontroverted evidence demonstrates that STC's decision to layoff Plaintiff was not motivated by retaliation.

■ Finally, to the extent Plaintiff claims Defendants accelerated the date of his layoff in retaliation for him engaging in a protected activity, that claim too must fail. Even assuming Plaintiff could establish a *prima facie* case of retaliation based on the decision to accelerate his layoff, Defendants have offered legitimate, nonretaliatory reasons that Plaintiff has failed to demonstrate were pretextual. As dis-

cussed in greater detail above, *see supra* I.A., after Plaintiff was notified of his impending layoff, he went to the home of Ms. Banks unannounced and uninvited to offer her a gift, in a seeming attempt to have her intervene on his behalf. Not only did this action violate section 5.2.2 of STC's Rules of Proper Business Conduct Policy, it also left Ms. Banks "scared," "shocked," and deeply disturbed.[11] Banks Dep. at 34. Moreover, the e-mail letter that she read when she returned to work that following morning, in which he stated he would "lose confidence to live" if he lost his job, left Ms. Banks with the impression that Plaintiff was "unstable," and that he "didn't have the will to live." *Id.* at 37. She further believed it was possible that Plaintiff posed a risk to himself and others working at the Suitland facility. *Id.* at 37–38. When she continued to receive additional e-mails from Plaintiff, she asked Donahue if it was possible to "accelerate [his layoff date] because [she] thought [they] were in an unstable and unsafe environment." Banks Dep. at 52. Donahue concurred, and on August 29, 2002, less than a year after he had interviewed and recommended Plaintiff for hire, Donahue informed him that his layoff was effective immediately.

 While an employee may not suffer retaliation for protected activity, either participating in a proceeding or opposing unlawful employment discrimination, the employee's own conduct must not be disruptive of the employer's business:

> Section 704(a), however, was not intended to immunize insubordinate, disrup-

tive, or nonproductive behavior at work. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222 (1st Cir.1976). An employer must retain the power to discipline and discharge disobedient employees.

*Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981).

 Plaintiff does not dispute that he went to Ms. Banks house, that he took her a "Chinese cake," that he sent the first e-mail, or subsequent e-mails thereafter. He unquestionably signed the Business Conduct Policy, certifying that he read and understood it. However, throughout Plaintiff's opposition brief, he suggests that his intentions were misunderstood, and that he in fact posed no danger to himself or others. What he cannot do, however, is dispute the effect his conduct had on Ms. Banks, as well as her (and Donahue's) perception of it. Although Plaintiff may have had benign intentions and, indeed, did not pose a harm, "it is not [the court's] province to decide whether the [stated] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for [Plaintiff's layoff]." *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 279 (4th Cir.2000) (quoting *DeJarnette v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir.1998)); *see also Evans,* 80 F.3d at 961–62 (" 'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff.") (quoting *Smith v. Flax,* 618

---

**11.** Section 5.2.2 of STC's Rules of Proper Business Conduct Policy provides:

> No employee is allowed to accept, solicit, or give bribes or gratuities. Bribes are anything of value given or received by an STC employee in return for favorable treatment by the recipient relative to STC business. Gratuities are anything of value given or received by an STC employee (even when

> there is no direct linkage to favorable treatment relative to STC business.) Gratuities include gifts, services, favors, entertainment, meals or anything of monetary value. Even an act that gives the appearance of having sought or received favorable treatment by giving or receiving gratuities is prohibited.

> Paper 65, Ex. 7.

F.2d 1062, 1067 (4th Cir.1980)). Thus, the possibility that Plaintiff's intentions might have been benign does not cast doubt on the veracity of Defendants' proffered explanations, nor does it demonstrate in the slightest way that Defendants accelerated his layoff in violation of federal law.

Lastly, Plaintiff testified that Donahue told him on the day his layoff was accelerated that it was because "We do not want you to sit down and write e-mail to the government to make a complaint." *See* Plaintiff's CSC Dep. at 167. This simply is not enough to create a triable issue of fact as to Plaintiff's retaliation claim. First, this statement is not inconsistent with Defendants' proffered reasons for laying him off, and, thus, does not contradict their explanation. It is undisputed that Plaintiff had been sending e-mails to the government, i.e., Ms. Banks. This fact is demonstrated by Plaintiff's own submissions in support of his opposition. *See* Paper 82, Ex. 7 (E-mails to Ms. Banks). It is undisputed that the content of those e-mails, as well as the frequency with which she was receiving them, led her to conclude that Plaintiff was unstable and posed a risk. Defendants assert this conclusion, coupled with Plaintiff's unannounced visit to her home bearing a gift, is what motivated the decision to accelerate Plaintiff's layoff. Thus, even if Donahue made this statement to Plaintiff, it is entirely consistent with the non-retaliatory reasons proffered, and, thus, casts no doubt on the veracity of those reasons.[12] At most, Donahue's statement, even assuming he did make it, indicates that Plaintiff's layoff was accelerated not because he had made, or was planning to make, a complaint for discrimination, but because of the manner in which he had been contacting Ms. Banks; a manner which she deemed to be threatening and harassing. Banks Dep. at 52, 55, 68; *see also* Paper 65, Ex. 17 (Letter from Ms. Banks to Harold Washington, Chief of Security, Suitland Federal Center (Aug. 28, 2002)). In light of the overwhelming evidence of Plaintiff's conduct during the weekend and week leading up to his accelerated layoff, conduct to which Plaintiff admits, the purported statement by Donahue, even assuming its truth, fails to raise a genuine issue of fact as to Plaintiff's claim of retaliation. *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997) ("A mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment."). Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

## IV. Conclusion

For the reasons stated above, Plaintiff's motion for leave to file a surreply will be granted, his "Urgent Motion" will be denied, and Defendants' respective motions for summary judgment will be granted. A separate Order will follow.

---

**12.** Moreover, Plaintiff's testimony regarding what Donahue said is contradicted by his own words in an e-mail he sent to Ms. Banks on August 29, shortly after Donahue informed him that his layoff was effective immediately. *See* Paper 82, Ex. 7. In this e-mail, of which the subject heading was "I be forced to leave, Why?," Plaintiff states, "Today I was forced to leave. Dave [Donahue] told me that the reason is that I came to your home without your agreement first. I do not believe that, I know you are very kind to me, you accepted my apolog[y.]" Thus, Plaintiff's own words immediately after Donahue let him go contradict his deposition testimony. Moreover, the remaining portions of the e-mail only serve to reinforce the veracity of Defendants' proffered reasons for accelerating Plaintiff's layoff.